

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-08-125-CV

IN THE INTEREST OF M.C., N.L., AND D.L.,
CHILDREN

------------

FROM THE 324TH DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. Introduction

In four issues, Appellant E.C. contests the sufficiency of the evidence to support the termination of her parental rights to M.C., N.L., and D.L. We affirm.

### II. Factual and Procedural History

At the time of the termination trial in March 2008, M.C. was seven years old, N.L. was five years old, and D.L. was two years old. M.C. and N.L. had

---

[1] *See* Tex. R. App. P. 47.4.

previously been removed from E.C. in 2004, after a referral to Child Protective Services (CPS) by a neighbor resulted in E.C.'s arrest for possession of a controlled substance. E.C. completed her service plan while pregnant with D.L., and in June 2006, CPS returned her children to her.

E.C. testified that she was currently incarcerated because she had violated the terms of the four years' community supervision she received for the deferred adjudication of the 2004 possession charge. She also testified that, with regard to the "crack cocaine" that led to her arrest in 2004, she had not been using it; N.L. and D.L.'s father, R.L., had given it to her to sell for him.[2] She also testified that she knew nothing about selling drugs, that she only did it twice, and that she did it so that he would not "put his hands on [her]," i.e., physically abuse her. She testified that when she sold crack cocaine, she would leave M.C. with her mother and turn the sales profits over to R.L.; that R.L. was mentally, physically, and sexually abusive to her throughout 2004; and that he would beat her while the children were asleep.[3] She added that

---

[2] In the same proceeding, the trial court also terminated the parental rights of R.L., the adjudicated father of N.L. and D.L., and of F.W., M.C.'s alleged biological father. R.L. and F.W. did not appeal.

[3] R.L. testified that he physically assaulted E.C. but that he "never beat her. Just smacked her up." He testified that the children were in the house, asleep in their room, when he abused their mother. He testified that the children never saw him assault E.C.

2

sometimes the children were awake and saw the domestic violence between her and R.L.; she did not know if he had ever harmed the children.

E.C. also testified that she used marijuana around her children, then immediately contradicted herself, stating, "No, I don't use drugs around my kids," and then explained that she would smoke "weed" outside on her patio while her children were inside the house. She admitted that she had cared for her children while under the influence of marijuana and that she had allowed R.L. and his girlfriend to care for the children when R.L. was under the influence of drugs.

E.C.'s community supervision was revoked because, in December 2006, she committed assault with bodily injury against the mother and sister of R.H., her alleged common law husband;[4] she was also charged with, and she pleaded guilty to, harassment and criminal trespass. E.C. claimed that R.H.'s mother attacked E.C. first, in front of the children, and that E.C. hit her back. E.C. testified that she gave R.H. temporary custody of her children when she knew she was going back to jail for violating the terms of her community supervision. She also testified that R.H. had a girlfriend while E.C. was incarcerated and that

_____

[4] E.C. testified that she began a relationship with R.H. in 2001. She testified that they were common law married because they were beneficiaries on each other's health insurance.

he was unable to take care of E.C.'s children because "him and his girlfriend were having confrontations, or whatever."

In March 2007, the State placed the children into foster care. In the affidavit the State submitted in support of its request for temporary managing conservatorship, the CPS caseworker averred that E.C. asked a friend to call CPS and request removal of the children from R.H. and for CPS to place them in foster care. E.C. testified that she remained in jail from March to July, that she had no contact with her children or R.H. during that time, that neither CPS nor R.H. notified her that her children were placed into foster care or taken away from R.H. while she was in jail, and that CPS did not mail her a service plan while she was in jail. She testified that a friend wrote to her in April or May and told her that her children were in foster care and that CPS "never gave [her] a service plan due to the fact that [she] knew what a service plan was." E.C. testified, "I just knew what I had to do," but she also testified that she did not know what a service plan was. She testified that she called CPS the day that she was released from jail but that the caseworker was out of the office that day.

E.C. testified that when she was released in July, she attempted to work on her service plan. E.C. acknowledged working her CPS service plan from 2004 to 2006 to get her children back but stated that with regard to the

4

second time her children were placed into foster care, "I didn't know that they actually wanted me to take these classes over again[,] [s]o I was aggravated with that situation."

E.C. testified that she tried to complete the service plan. She stated, "whenever I'm out [of jail], I go see my children"; that she was hampered in her ability to get her drug tests and other services because she did not have identification and a caseworker was supposed to go with her;[5] and that she visited her children around four or five times before she was arrested again in September 2007 when R.H. accused her of committing criminal trespass.[6] E.C. also testified that while she was out of jail, she had a job and a house that her grandfather had left to the family, so her "kids got a free bedroom."

The ongoing CPS caseworker testified that E.C. did not make any appropriate progress on her service plan while she was out of jail. She testified that the three children had been in the same foster home for six to seven months; that the children called their foster mother, "Mom"; that the children

---

[5] E.C. testified that she needed her birth certificate, her social security card, and her identification for the services and that she lost all of those items when she lost her apartment.

[6] E.C. testified that R.H. sought and received a protective order against her for coming onto his property and stealing his dog and that R.H. was supposed to get the protective order removed because she did not actually steal his dog.

5

had stability and were progressing because of that stability; and that every time they visited any of their biological family, according to the foster mother, the children regressed behaviorally and emotionally by becoming very aggressive and by having "accidents in their pants." According to what the CPS caseworker had been told by the foster mother, two-year-old D.L. had "the foul-language vocabulary of an adult man," which manifested only after visits with his biological family. She recommended that E.C.'s parental rights be terminated; she testified that the State's plan for the children was for them to be adopted by their current foster parents.

The children's attorney ad litem testified that he made numerous home visits with the children and their foster mother, that the foster home was very stable, and that the children were very well cared for there. He testified that after visits with E.C., the children were very despondent and suffered a negative impact on their overall mental health. He agreed that the only words D.L. knew were profane and that he could reasonably state that D.L. did not learn those words in the foster home. He testified that the foster mother told him that she was willing to adopt the children and opined that she would be the best person to adopt the children. He recommended termination of E.C.'s parental rights.

The trial court terminated E.C.'s parental rights, finding by clear and convincing evidence that she knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the children's physical or emotional well-being; that she engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being; that she constructively abandoned the children; and that termination of E.C.'s parental rights to the children was in the children's best interest. *See* Tex. Fam. Code Ann. §§ 161.001(1)(D), (E), (N), 161.001(2) (Vernon Supp. 2008). This appeal followed.

### III. Discussion

E.C. complains that the evidence is not legally and factually sufficient to support the trial court's endangerment and constructive abandonment findings under section 161.001(1) and that the evidence is not factually sufficient to support the trial court's best interest finding under section 161.001(2).

### A. Standard of Review

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are

7

not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re E.M.N.*, 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subdivision (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). This intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (Vernon 2002).

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the fact-finder resolved any disputed facts in favor of its finding if a reasonable fact-finder could have done so. *Id.* We must also disregard all evidence that a reasonable fact-finder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is

9

contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable fact-finder could and disregard contrary evidence unless a reasonable fact-finder could not. *Id.*

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the fact-finder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we must defer to the fact-finder's determinations as long as they are not unreasonable. *Id.* at 573.

In reviewing the evidence for factual sufficiency, we must give due deference to the fact-finder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact-finder could reasonably form a firm conviction or belief that the parent violated the endangerment or constructive abandonment provisions of section 161.001(1) and that the termination of the parent's parental rights would be in the best interest of the children. *C.H.*, 89 S.W.3d at 28. If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or

conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## B. Endangerment

In her first two issues, E.C. complains that the evidence is not legally and factually sufficient to support the trial court's findings under subsections (D) and (E) because she "did not voluntarily, deliberately, and consciously engage in a course of conduct" that endangered the children and that her conduct did not create an environment detrimental to the children's well-being.

The court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangers the child's physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(1)(E). "Endanger" means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, [but] it is not necessary that the conduct be directed at the child or that the child actually suffers injury. Rather, 'endanger' means to expose to loss or injury; to jeopardize." *Boyd*, 727 S.W.2d at 533 (citation omitted); *In re J.M.M.*, 80 S.W.3d 232, 241 (Tex. App.—Fort Worth 2002, pet. denied), *disapproved on other grounds*, *In re J.F.C.*, 96 S.W.3d 256 (Tex. 2002).

11

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act, and it must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.); *J.M.M.*, 80 S.W.3d at 241; *see also In re U.P.*, 105 S.W.3d 222, 236 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding that the creation of an "emotional vacuum" in the child's life by being absent for more than twelve months due to incarceration was evidence of endangering the child's emotional well-being). The specific danger to the child's well-being may be inferred from parental misconduct alone. *Boyd*, 727 S.W.2d at 533.

To determine whether termination is necessary because of endangerment, courts may look to parental conduct both before and after a child's birth*. In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). Conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied) (using illegal drugs and violating parole provided sufficient evidence of endangerment). However, the relationship of the parent and child, as well as efforts to improve or enhance parenting skills,

12

are also relevant in determining whether a parent's conduct results in "endangerment" under section 161.001(1)(E), even when the parent is incarcerated. *In re D.T.*, 34 S.W.3d 625, 640 (Tex. App.—Fort Worth 2000, pet. denied).

Imprisonment is a factor to be considered by the trial court on the issue of endangerment. *Boyd*, 727 S.W.2d at 533. But imprisonment alone does not constitute endangering conduct; the State must show that the incarceration is a part of a course of conduct that is endangering the child. *In re D.M.*, 58 S.W.3d at 812–13 (noting that mother's frequent incarcerations affected her ability to properly care for her children and to comply with her service plans); *see also In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.) (observing that father's incarceration affected his ability to ensure that his child was properly taken care of, prevented him from funding better living conditions or providing financial support for the child, and indicated a course of conduct that was endangering to his child); *D.T.*, 34 S.W.3d at 639 (looking not only to incarceration as a factor in factual sufficiency but also the expected length of sentence and whether the underlying conduct is of a type, in and of itself, from which endangerment may be inferred).

E.C. claims that there was "ample" evidence that she had a history of cooperating with the State and progress on her service plan and that the

13

removal was based only on her incarceration and not on any abuse allegations. E.C. cites in support of her argument her employment prior to her incarceration and intent to return to employment postincarceration; her visits with the children after they were placed in foster care, as well as the fact that she did not cancel or miss any scheduled visits; and the administrative difficulties that she encountered in working on the service plan. E.C. states that while there was evidence of her past involvement with illegal drugs, there was also evidence that she tried to protect the children from being exposed to drugs in the home and that she provided for the children's medical needs in an appropriate manner.

The record reflects that E.C., if not her children, suffered from domestic violence at R.L.'s hands; that E.C. used drugs while her children were home; that E.C. repeatedly violated her community supervision, at least once in a violent manner; and that E.C. left her children with someone who was unprepared to care for them when she went to jail.[7] And notwithstanding the evidence referred to above by E.C., her own testimony reflects a pattern of conduct that endangered her children by subjecting them to significant

_____

[7] E.C. testified that it was her understanding that the children were going to stay with R.H. while she was incarcerated and that R.H. never informed her that her children were put into foster care in March 2007.

14

uncertainty and instability. She testified, "I guess," when asked whether she was aware that a new violation of her community supervision could result in revocation when she committed the December 2006 assault, which resulted in the children's March 2007 removal. Only a month and a half after being released from prison for that assault, she committed another violation, resulting in her incarceration during the termination trial. When testifying about how R.L. abused her, E.C. asked, "What does this have to do with my children?" although she later acknowledged that exposing the children to a pattern of domestic violence could harm the children in the long run. When asked why she thought the trial court should not terminate her parental rights, E.C. replied, "Because I'm not really with [R.L.]. I really wasn't with [R.L.]. The reason me and my husband [R.H.] keep getting into it [is] because he thinks I'm going to go back to [R.L.]."

Furthermore, the evidence to which E.C. refers in order to demonstrate that she tried to protect the children from being exposed to drugs in her home could have, instead, been construed by the trial court as more evidence that E.C.'s overall course of conduct endangered the children. E.C. testified that she discovered that R.L. sold crack cocaine out of her apartment, stating, "When I came home in 2004 from being arrested, I found that baggie in my house, and one day I seen him in the restroom cutting up the crack. And I told

him, I say, 'Don't do that in front of my kids.'"  And while she testified that the drug sales occurred during 2001 and 2004, E.C. did not set a date with regard to when she smoked marijuana—"the only drug I use, if that's what you want to call it"—outside her home while her children slept or played inside.  She also admitted that she cared for the children while under the illegal drug's influence.

Some of E.C.'s testimony about her cooperation with the State and progress on her service plan was contradictory:  she stated that she did and did not know what a service plan was and that there were misunderstandings between herself and CPS.[8]  She testified both that she did and did not behave appropriately at all CPS visits with her children.  Her testimony about her performance of the service plan was disputed by the CPS caseworker's testimony that E.C. had not made appropriate progress on her service plan. With regard to her testimony about  providing for her children's medical needs, E.C. was unable to name the doctor that the children currently went to, stating, "I don't know.  All my kids take karate."  But she was able to name the one she

---

[8] E.C. testified that she attempted to work services in July when she was released from jail, that CPS aggravated her by making her retake some classes that she had previously taken during the earlier removal of her children in 2004, and that no one from CPS ever took her to get her drug tests done. She testified that she did have a job, attended visits with the children, had not taken any drugs, did her psychological evaluation, and had been working with her caseworker.

16

had used when the children lived with her and testified that she would take them "[f]or their checkup."

The trial court could have reasonably resolved the only disputed fact, E.C.'s service plan performance, in favor of the endangerment finding based on the CPS caseworker's testimony and E.C.'s own testimony about the service plan. Reviewing the evidence in the light most favorable to the endangerment finding and the judgment, we conclude that the trial court could have reasonably formed a firm belief or conviction that E.C.'s conduct endangered her children. *See J.P.B.*, 180 S.W.3d at 573. And, giving due deference to the trial court's finding, with regard to the entire record, the trial court could also have reasonably formed the same firm conviction or belief that E.C.'s conduct met the requirements of subsection (E). *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28. Therefore, we conclude that the evidence was both legally and factually sufficient to terminate E.C.'s parental rights based on the endangerment by conduct ground in subsection (E), and we overrule her second issue.[9]

---

[9] Because, along with a best interest finding, a finding of only one ground alleged under section 161.001(1) is sufficient to support a judgment of termination, we need not address E.C.'s first and third issues. *See* Tex. R. App. P. 47.1; *see also E.M.N.*, 221 S.W.3d at 821.

17

## C. Best Interest

In her fourth issue, E.C. complains that the evidence is not factually sufficient to support the trial court's best interest finding under section 161.001(2) of the family code.

Prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (Vernon 2002). There is also a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the children include the children's desires; the children's emotional and physical needs, now and in the future; the emotional and physical danger to the children now and in the future; the parental abilities of the individuals seeking custody; the programs available to assist these individuals to promote the best interest of the children; the plans for the children by these individuals or by the agency seeking custody; the stability of the home or proposed placement; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id.* On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

E.C. specifically contends that the evidence at trial presents a clear conclusion that termination of her parental rights is not in the children's best interests when considered in light of the children's emotional and physical needs and the excuses for her acts or omissions. With regard to the children's emotional and physical needs, now and in the future, she claims, based on her testimony that D.L.'s emotional state has declined since his placement in foster care and that M.C. failed to advance to first grade, that there have clearly been significant setbacks in the children's emotional development since their removal.

Some of E.C.'s evidence is contradicted by her own testimony: she testified that M.C. "flunked" kindergarten "due to the fact that [E.C.] went to jail." E.C. testified that there was nothing wrong with D.L. when she left him and that she never used foul language in front of her children. The CPS

19

caseworker testified that D.L. was not speaking at an appropriate level, that he was receiving speech therapy, and that he would use foul adult language after visits with his biological family members. She testified that M.C. and N.L. receive tutoring through their school, lots of help from their foster mother, and counseling.

E.C. next argues that, with regard to excuses for her acts or omissions, there was "ample evidence regarding difficulties that [she] encountered while attempting to parent the children," including evidence indicating that she was a victim of severe mental, physical, and sexual abuse; that she encountered administrative difficulties with CPS that prevented her completion of some of the services in her service plan; and that her incarceration hampered her ability to complete the services. Notwithstanding E.C.'s undisputed problems, however, the record reflects that the trial court could have reasonably concluded that some, if not all, of E.C.'s problems stemmed from her own choices, made without apparent regard for the best interest of her children.

The CPS caseworker testified that all three children had been in the same foster home for six to seven months, that the children had stability in that home, that the children were progressing because of that stability, and that it would be disruptive to the children's progress to be returned to E.C. because each time the children visited with their biological family members, "there is a

20

behavioral and emotional regression." She testified that the State's plan for the children was for them to be adopted by their current foster parents. The children's attorney ad litem also testified that the foster home was very stable, that the foster family took good care of them, that the foster mother told him that she was willing to adopt the children, and that he thought she would be the best person to adopt them. E.C. testified that she had a place for the children to stay, but she provided no description, other than to establish that the children had "somewhere to stay" in the house that her grandfather left to the family.

The CPS caseworker testified that she had observed the children with their foster family, that they seemed very relaxed, that they referred to their foster mother as "Mom," and that they acted like they were at home. The children's attorney ad litem testified that the children reported to him that they enjoyed the environment in the foster home; he also testified that he thought the children's visits with their biological family had a negative effect on the children.

Based on the entire record, the trial court could have reasonably formed a firm conviction or belief that termination of E.C.'s parental rights would be in the best interest of the children. *See C.H.*, 89 S.W.3d at 28. Therefore, we

21

conclude that the evidence to support the trial court's best interest finding was factually sufficient, and we overrule E.C.'s fourth issue.

### IV. Conclusion

Having overruled E.C.'s dispositive issues,[10] we affirm the trial court's judgment terminating E.C.'s parental rights to M.C., N.L., and D.L.

PER CURIAM

PANEL: MCCOY, HOLMAN, and GARDNER, JJ.

DELIVERED: October 9, 2008

---

[10] *See* Tex. R. App. P. 47.1.